# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RUTHIE JOHNSON, | ) | |
| | ) | No. 14 CV 8425 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) | |
| | ) | August 25, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Ruthie Johnson applied for disability insurance benefits ("DIB") claiming that she is disabled by asthma, sleep apnea, reflux disease, sciatica, a torn meniscus, arthritis, heel spurs, morbid obesity, hypertension, depression, and hypercholesterol. After the Commissioner of the Social Security Administration denied her application, Johnson filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Johnson's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed:

## Procedural History

Johnson applied for DIB in September 2011 claiming a disability onset date of June 8, 2008. (Administrative Record ("A.R.") 18, 40, 193.) After her application was denied initially and upon reconsideration, (id. at 18), Johnson timely requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 103-

13). The ALJ held a hearing on May 20, 2013. (Id. at 18.) On July 23, 2013, the ALJ issued a decision denying Johnson's application. (Id. at 15-17.) When the Appeals Council denied Johnson's request for review, (id. at 1-3), the ALJ's denial of benefits became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Johnson filed this lawsuit seeking judicial review of the Commissioner's final decision, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 5); *see* 28 U.S.C. § 636(c).

## Background

Johnson was 51 years old at the time of her May 2013 hearing. At the hearing, she presented both documentary and testimonial evidence in support of her application for DIB. (A.R. 18.) A medical expert ("ME") and a vocational expert ("VE") also testified at the hearing. (Id.)

### A. Medical Evidence

The earliest report regarding Johnson's physical impairments is a May 5, 2008 outpatient physical therapy evaluation. (A.R. 40, 420.) Johnson reported a right-knee injury she sustained a year earlier while carrying laundry up a set of stairs, problems with asthma, occasional anxiety, arthritis, back pain, hypertension, and shortness of breath. (Id. at 422-23.) Johnson was diagnosed with "[p]ersistant [right] knee pain," with a decreased range of motion, decreased strength, and gait deviations. (Id. at 420.) In June 2008, Johnson's physical therapist reported that she was ambulating without pain, that all of her physical therapy goals had been met, and that she reported minimal pain and stiffness when sitting for prolonged

2

periods. (Id. at 434.) According to Johnson, this pain and stiffness did not interfere with her daily activities. (Id.) This report took place four days after the alleged disability onset date.

In July 2008, Dr. Cesar Herrera performed a transesophageal echocardiogram and stress test. (Id. at 271-72, 347-48.) The echocardiogram showed mostly normal size in the chambers of Johnson's heart with mild enlargement of the left atrium. (Id. at 347.) The stress test was terminated when Johnson began experiencing shortness of breath. (Id. at 272.) Then in August 2008, Dr. Sarah Alderman found mild obstructive sleep apnea during non-REM sleep, which was treated and controlled with continuous positive airway pressure ("CPAP").[1] (Id. at 269-70.)

There are no relevant medical records after 2008, (see id. at 42), until May 2011 when Johnson was taken to a hospital with complaints of non-radiating chest pain on her right side, (id. at 40-42, 45, 274, 277-78, 327). The pain started days earlier when Johnson was doing yardwork. (Id. at 327.) She was admitted and released from the hospital after one day. (Id.)

In October 2011 Johnson reported unexplained weight gain and a significant change in her emotional status since seeking care for pain in her right shoulder, upper arm, back, and both knees. (Id. at 468-69.) The following month, Johnson underwent a consultative examination with Bureau of Disability Determination Services ("DDS") physician Dr. Joseph Youkhana. (Id. at 494.) At her examination

---

[1] In July 2012, Dr. Alderman repeated that test and found moderate obstructive sleep apnea, which remained controlled with CPAP. (Id. at 576-77.)

3

Johnson denied any heart attack or heart failure. (Id.) Dr. Youkhana documented the following conditions: obesity; multi-joint pain, including her right knee, right shoulder, and back; well-controlled hypertension; mild and stable obstructive/restrictive lung disease; and sleep apnea treated with a CPAP machine. (Id. at 496.) Johnson was found to have normal fine dexterity in both hands. (Id. at 499.)

DDS also evaluated Johnson's psychiatric issues. Dr. Myrtle Mason conducted a psychological examination and noted that Johnson's chief complaint was related to back pain, sciatica, and knee pain. (Id. at 481, 483.) Johnson reported treatment for emotional problems in 2000 when she was prescribed Zoloft for approximately a year, without any hospitalizations. (Id. at 485.) Johnson exhibited no difficulties during a concentration test. (Id. at 488.) Dr. Mason calculated a Global Assessment of Function ("GAF") of 68, indicating that Johnson had "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but [was] generally functioning pretty well, [and] has some meaningful interpersonal relationships." *See Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed. rev. 2000)).[2] Dr. Glen Pittman, a state

---

[2] In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical*

4

agency medical consultant, reviewed Johnson's psychiatric history and found she has nonsevere affective disorder. (A.R. 504.)

A December 2011 MRI of Johnson's right knee detected a torn medial meniscus. (Id. at 530.) In January 2012, Dr. Charles Mercier performed a partial medial meniscectomy procedure on Johnson's right knee. (Id. at 537-39.) In April 2012, Johnson reported a setback in her right knee following several days of yardwork and frequent squatting. (Id. at 26, 679.) A few weeks later, DDS physician Dr. C.A. Gotway concluded that Johnson is able to function at the sedentary level because she reported no back problems, walked without an assistive device, and had no mental conditions causing more than slight limitations. (Id. at 566-69.)

The following year in February 2013, Dr. Desiree Fabros-Munez, Johnson's treating physician, completed a Residual Functional Capacity ("RFC") form for Johnson. (Id. at 585.) She reported diagnoses of osteoarthritis of the lumbar spine and pain in the knees and the right shoulder. (Id.) She opined that Johnson experiences frequent interference with attention and concentration and that she can sit for no more than 30 minutes at one time, stand for no more than 15 minutes at one time, and sit and stand for less than 2 hours per day. (Id. at 586-87.) She further opined that Johnson requires 5 minutes to walk around every 30 minutes, can use each hand to grasp, turn, and twist objects 10 to 20 percent of each day, and can use each arm for overhead reaching 5 to 10 percent of each day. (Id. at 587-88.)

---

*Manual of Mental Disorders*, at 16 (5th ed. 2013)). However, the GAF metric was still in use at the time of Johnson's evaluation.

5

### B. Johnson's Hearing Testimony

Johnson testified that at the time of the hearing she was 51 years old, about 5 and a half feet tall, and weighed 285 pounds. (A.R. 48-49.) She last worked at Merit Lincoln Park Hospital ("Merit") but was laid off in April 2008 because of the hospital's financial problems. (Id. at 49, 195.) She testified that her physical condition prevents her from performing the duties of an administrative assistant or an executive assistant. (Id.) Johnson explained that around the home she performs limited food preparation, such as simple cooking, boiling water, microwaving, and making salads. (Id. at 53.) She said that her husband cleans the house and she does the laundry. (Id.)

According to her testimony a significant amount of Johnson's daily activity is devoted to her education. She enrolled as a full-time undergraduate student in 2009, attending classes in person and online. (Id. at 48.) As of the hearing, Johnson had completed her bachelor's degree and was "bored just sitting at home," so she enrolled in graduate school. (Id. at 47.) She said she drives herself to campus twice weekly to attend lectures. (Id. at 46.) After Johnson testified about her ability to attend eight hours of classes per week, she then said that she could only sit for 15 to 20 minutes at a time. (Id. at 47, 50.) Johnson reported being a straight-A student and hoped to operate a business after graduation—possibly a laundromat, car wash, or jump zone for children. (Id. at 60.)

Johnson testified that following her January 2012 right knee surgery she had improved stability, but that she still has pain and arthritis in both knees. (Id. at

54-55.) She reported that her daily pain level is at a four on a ten-point scale, but said that it spikes during cold or rainy weather. (Id. at 55-56.) When the pain spikes between eight and ten, Johnson takes Flexeril to relax her muscles. (Id. at 56.) Johnson reported back pain that sometimes radiates down the back of her leg, and that she wakes up with back pain every day, usually at a level of three on a ten-point scale. (Id. at 57.) Johnson explained that she manages her pain with Flexeril, Aleve, and Ibuprofen. (Id. at 58.)

## C. Medical Expert's Hearing Testimony

The ME testified that Johnson has several impairments, including mild obstructive sleep apnea, extreme or morbid obesity with a BMI of 42.1, pre-diabetes or impaired fasting glucose, hypertension without heart failure, pain in the right shoulder, bronchial asthma, degenerative joint disease and meniscal tear of the right knee, and low back pain (among other back issues). (A.R. 65-76.) The ME noted that during a 2011 consultation, neurosurgeon Dr. John Song observed that Johnson's "gait was normal, motor strength was five over five, [and] range of movement of both cervical and lumbar spine were normal." (Id. at 71.) Dr. Song concluded, however, that Johnson was a candidate for microdisectomy at the L5-S1 vertebrae because of an abnormality revealed in the MRI scan. (Id.)

The ME testified that Johnson's impairments would reduce her ability to function in a work setting. (Id. at 77.) However, because he found no right ventricular hypertrophy recorded in the medical records, the ME did not consider moderate pulmonary hypertension as a contributing factor to any reduction in

7

Johnson's functional capacity. (Id. at 43.) Additionally, the ME could not find clinical support describing the intensity of pain management that would lead him to conclude that Johnson was limited to less than two hours of sitting and two hours of standing in a workday. (Id. at 77.) He also found insufficient documentation of impairment in the sacroiliac and hip joints, so the ME could not conclude that Johnson needed a sit/stand option. (Id.) He explained that his opinion was consistent with the opinion of a previous medical consultant who found that Johnson has the capacity to perform sedentary work. (Id.) The ME then confirmed that he took Johnson's obesity into account in all of his opinions. (Id. at 79.)

**D.  Vocational Expert's Hearing Testimony**

The VE testified that Johnson's job at Merit was equivalent to an administrative assistant position, which the Dictionary of Occupational Titles would categorize as an executive assistant. (A.R. 50-51.) An administrative assistant position is a sedentary position performed at the light exertional level. (Id. at 51.) Prior to working for Merit, from 1982 until 2007, Johnson worked at Lurie's Children's Hospital as an administrative assistant and executive assistant. (Id. at 195.) The ALJ presented the VE with the following hypothetical:

> Okay. So assume you've got -- well, we've got the two jobs, administrative assistant, medical secretary, with the SVP of 7 and then the SVP of 6. Assume you're dealing with an individual the same age of the claimant, same educational background, and past work experience. I note that [at] this point the claimant has a Bachelor's. She does not have her Master's yet, but she's working towards it. Assume the individual retains [an RFC] for sedentary work. We're talking 10 pounds occasionally, less than 10 pounds frequently, stand/walk a total of two hours in a workday with . . . [t]hirty minutes at one time of standing or walking. She can sit six hours. Push/pull is

8

limited by the exertionals. Posturals, ramps can be done frequently and then never ladders, kneeling, crouching, crawling. And by ladders, it's ladders, ropes, scaffoldings. The rest of the posturals are occasional. Manipulation on her left side no limit. Right side upper extremity, we're going to limit her to frequent overhead, frequent all directions, frequent fine and gross manipulation. Environmental, no unprotected heights, no commercial driving, and I want her to avoid concentrated exposure to fumes, odors, pulmonary irritants, avoid concentrated exposure to extreme cold, humidity, or heat. Could this individual perform any of claimant's past relevant jobs?

(Id. at 84-85.) The VE responded that a person with these impairments could still perform the work of an administrative assistant but not the work of a medical secretary because medical secretaries must occasionally crouch. (Id. at 85.)

**E. ALJ's Decision**

On July 23, 2013, the ALJ issued a decision denying Johnson's application for DIB. (A.R. 18-30.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a), at step one, the ALJ determined that Johnson had not engaged in substantial gainful activity since her alleged onset date of June 8, 2008. (Id. at 20.) At step two, the ALJ found that Johnson has several severe impairments including degenerative disc disease, degenerative joint disease of the right knee and right shoulder, asthma, obstructive sleep apnea, and morbid obesity. (Id.) The ALJ found Johnson's hypertension, gastroesophageal reflux disease, and depression to be nonsevere impairments. (Id.)

At step three, the ALJ found that Johnson does not have an impairment or combination of impairments medically equal to any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, including 1.02A, 1.02B, 1.04, 3.00, 3.03, and 12.00, even when her obesity is taken into consideration. (A.R. 21-23.) Before turning to

9

step four, the ALJ found that Johnson has the RFC to perform sedentary work "except she can only stand/walk for 30 minutes at one time; never climb ladders, ropes or scaffolds, kneel, crouch or crawl; occasionally climb stairs, balance and stoop; frequently climb ramps; frequently use the right upper extremity for reaching, overhead reaching, fine manipulation and gross manipulation, [with] no limitation on manipulation with her left upper extremity [and] no exposure to unprotected heights or commercial driving; [and should] avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, and pulmonary irritants." (Id. at 23.) At step four, the ALJ found Johnson capable of performing her past relevant work as an administrative assistant and, accordingly, found that she is not disabled. (Id.)

**Analysis**

In seeking judicial review Johnson challenges the weight the ALJ placed on her treating physician's opinion and the ALJ's assessment of her credibility. This court reviews the ALJ's decision to ensure it is based on the correct legal criteria and supported by substantial evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Under that standard, the court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even if "reasonable minds can differ over whether the applicant is disabled," *Shideler v. Astrue*, 688 F.3d 306,

310 (7th Cir. 2012). The substantial evidence standard requires an ALJ to logically bridge the evidence and the ALJ's conclusion, but not necessarily to provide a comprehensive written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Although the substantial evidence standard is generous, "where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). And where the Commissioner commits an error of law that is not harmless the court must reverse the decision regardless of the evidence supporting the factual findings. *See Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### A. Treating Physician's Opinion

Johnson argues that the ALJ failed to comply with 20 C.F.R. § 404.1527 and SSR 96-2p when she rejected her treating physician's opinions that Johnson had limitations with her upper extremities on her left side and that she required a sit/stand/walk option to address pain and stiffness. (See R. 10, Pl.'s Mem. at 9.) Specifically, Johnson takes issue with the ALJ's conclusion that Dr. Fabros-Munez's opinions were not supported by "significant clinical and laboratory" findings consistent with disability, generally lacked support in the medical record, were inconsistent with other evidence, and may have been a byproduct of sympathy for Johnson. (A.R. 28-29.) Johnson also argues that the ALJ failed to adequately explain her decision and overlooked entire lines of evidence.

11

An ALJ must provide "good reasons" for how much weight she gives to a treating source's medical opinion. *See Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our . . . decisions for the weight we give your treating source's opinion."). An ALJ must consider several factors when considering the weight to give to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(1)-(6). Based on these factors, an ALJ is expected to give greater weight to a treating physician if that physician is "able to provide a detailed, longitudinal picture" that is well-supported by acceptable clinical and laboratory diagnostic techniques over an extended period of time. *Id.* When an ALJ gives less than controlling weight to a treating physician's opinion, she must analyze: (1) the length and frequency of treatment, generally giving more weight to a medical opinion "the longer the treating source has treated" the claimant; and (2) the nature and extent of the treatment relationship, generally giving more weight to a treating source with knowledge of the impairment based on the "treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." 20 C.F.R. § 404.1527(c)(2)(i)-(ii). These factors strike a balance between the benefit derived from a physician's ability to observe a claimant over an extended period and the danger that the same physician might find a disability out of loyalty. *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011). An ALJ may discount a treating physician's opinion when it is unsupported by medically acceptable diagnostic techniques or is inconsistent with other substantial evidence. *Stepp v.*

*Colvin*, 795 F.3d 711, 719 (7th Cir. 2015); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, the ALJ was not required to depend solely on the treating physician's opinion expressed in the RFC form because, as she observed, it is not supported by the physician's own treatment records. *See Stepp*, 795 F.3d at 719; *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The ALJ explained that Dr. Fabros-Munez's RFC assessment allowed for left arm use less than 20 percent of the day. (A.R. 28.) However, Dr. Fabros-Munez's own notes reference treatment for Johnson's right shoulder pain and knee pain, not Johnson's left hand or arm. (Id.) The ALJ also cited to Johnson's x-rays demonstrating only mild degeneration in her right shoulder, and full grip strength in her right hand. (Id.) In addition, the ALJ noted the length and nature of Dr. Fabros-Munez's treatment of Johnson, which spanned from 2008 to 2013—but with a significant gap in the medical records between 2008 and 2011. (See id. at 24-25, 27-28, 45.) While it is true that the ALJ unnecessarily conjectured about the possibility that Dr. Fabros-Munez may have sympathized with Johnson, the ALJ admitted that such a motive is difficult to confirm and did not base her finding on the doctor's possible motives. (Id. at 29.) Regardless, an ALJ may discount the treating physician's opinion if she offers "good reasons" to support her conclusion. *Santore v. Astrue*, No. 11 CV 7391, 2015 WL 1917163, at *8-9 (N.D. Ill. April 28, 2015). The inconsistency between Dr. Fabros-Munez's own notes and the RFC opinion provided a legitimate basis to discount that aspect of the

opinion. *See Stepp*, 795 F.3d at 719; *Ketelboeter* 550 F.3d at 625. Accordingly, the ALJ properly rejected Dr. Fabros-Munez's opinion on Johnson's left-arm limitations.

The ALJ applied similar logic when rejecting Dr. Fabros-Munez's opinion that Johnson requires a sit/stand/walk option. "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" when defining an RFC. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citing *Diaz*, 55 F.3d at 306 n.2). In particular, an ALJ may reject a physician's opinion that a claimant has limited ability to sit, stand, or walk when unsupported by medical evidence. *Diaz*, 55 F.3d at 307-08. And the ALJ "need not provide a complete written evaluation of every piece of testimony and evidence . . . ." *Id.* at 308 (finding the minimal articulation standard met when the court could track the ALJ's reasoning and it felt assured that important evidence was considered).

Here, the ALJ considered and weighed Dr. Fabros-Munez's opinion concerning the extent of Johnson's limitations, but ultimately decided to reject the opinion because Dr. Fabros-Munez's "treatment notes fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (A.R. 28.) In reaching this conclusion the ALJ explained that the ME "testified that the record failed to show the necessary evidence to support limiting the claimant to 2 hours or less each of sitting or standing/walking." (A.R. 28-29.) Specifically, the ME pointed to flaws in Dr. Fabros-Munez's opinion, testifying that he could not agree with a "conclusion of less than two hours sitting

14

and two hours of standing" per workday because the record does not contain the appropriate clinical findings or pain management. (See A.R. 77-78). The ME also testified that he could not agree that a sit/stand/walk option is necessary because the record does not document a 12-month period of impairment of the sacroiliac and hip joints. (Id.) While the ALJ's discussion on this point is brief, she provides the minimal level of articulation necessary to connect the evidence to her conclusion that Dr. Fabros-Munez's opinions are unsupported. *See Diaz*, 55 F.3d at 307-08. Accordingly, the ALJ properly rejected Dr. Fabros-Munez's opinion on the sit/stand/walk option.

**B. Credibility Analysis**

Johnson argues that the ALJ failed to properly assess her testimony.[3] (See R. 10, Pl.'s Mem. at 8.) She contends that the ALJ "made it clear during [the] hearing and in [the] decision that [the ALJ] was uninterested in discussing or reviewing [her] reported limitations and symptoms." (Id. at 13.) Johnson further argues, citing *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), that the ALJ impermissibly discounted her testimony after determining it to be unsupported by objective evidence. (R. 10, Pl.'s Mem. at 13.)

Johnson's reliance on *Carradine* is misplaced. The *Carradine* court explained that reliance on subjective pain complaints "invites the unscrupulous applicant to

---

[3] The Social Security Administration recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). SSR 16-3p supersedes SSR 96-7p and eliminates the term "credibility." *Id.* at *1. The outcome in this case is not affected by the updated SSR.

15

exaggerate . . . her pain without fear of being contradicted by medical evidence." *Carradine*, 360 F.3d at 753. In *Carradine,* the claimant's psychological pain—factually distinguishable from the physical pain at the center of this case—could not be verified, and because there were no physical ailments, the ALJ had difficulty making sense of the psychological pain. *Id.* at 755. Unlike in *Carradine*, the ALJ in this case never touched on the issue of psychosomatic pain nor intense pain from an undetermined source. *See id.* at 754-55; *Spies v. Colvin*, 641 Fed. Appx. 628, 633-34 (7th Cir. 2016). That is because Johnson contends her pain is based on physical ailments, meaning her physical ailments and pain (to the degree they exist) should be documented in the record.

The ALJ reasonably cited a lack of objective medical evidence as one reason among several she gave to explain why she discredited Johnson's description of her pain severity. For example, the ALJ noted the lack of evidence of pain management other than over-the-counter pain relievers Johnson used in 2013. (A.R. 27.) The ALJ also noted that Johnson testified that she could only sit for 20 minutes, yet successfully drove herself to attend business classes two nights per week for several hours while working toward her master's degree. (Id. at 24.) The ALJ also considered that Johnson's treatment had been "essentially routine and/or conservative in nature," that Johnson had been hospitalized only one time and all testing results from her stay were normal, that Johnson required no inpatient treatment for any impairment, and that Johnson's only surgical procedure related to an alleged impairment was a single knee operation. (Id.) After considering the

evidence, the ALJ reasonably concluded that Johnson had not received the medical treatment one would expect to treat her alleged level of disability. (Id.)

More importantly, the ALJ did not discount Johnson's credibility solely because her pain complaints lacked the support of objective evidence. The ALJ also gave the following reasons: (1) in June 2008, just four days after Johnson's alleged onset date, Johnson met all physical therapy goals after 12 sessions designed to treat her right knee pain, (id. at 24-25); (2) in September 2008, Johnson reported the ability to exercise for 30 minutes per day on an elliptical machine and feeling refreshed in the morning after starting CPAP treatment to address her shortness of breath, (id. at 25); and (3) in January 2009, Johnson continued to report shortness of breath but could still shovel snow during the winter, (id.). The ALJ noted that Johnson's daily activities exceeded what one would expect for a person suffering from the symptoms and limitations alleged. (Id. at 24.)

Although the Seventh Circuit would reject an analysis in which the ALJ equated daily activities with an ability to engage in full-time employment, *Schumaker v. Colvin*, 632 Fed. Appx. 861, 866 (7th Cir. 2015), that is not what happened here. The ALJ evaluated Johnson's daily activities against the asserted impairments and found a mismatch there supporting a finding that Johnson exaggerated the degree of her impairments. *See id.* (condoning an evaluation of daily activities against alleged impairments when assessing a claimant's credibility (citing 20 C.F.R. § 404.1529)). This court cannot say that the ALJ's reasoning or

17

conclusions were patently wrong and, accordingly, must uphold the ALJ's credibility finding. *See Spies*, 641 Fed. Appx. at 633.

## Conclusion

For the foregoing reasons, Johnson's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

**Young B. Kim
United States Magistrate Judge**